IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Bobby Smith, | ) | C/A No.: 1:14-3387-DCN-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Commissioner of Social Security Administration, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

     This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his claims for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be reversed and remanded for further proceedings as set forth herein.

## I.    Relevant Background

### A.    Procedural History

On July 31, 2009, Plaintiff filed applications for DIB and SSI in which he alleged his disability began on October 21, 2001.[1] Tr. at 111, 112, 242–45, 246–52. His applications were denied initially and upon reconsideration. Tr. at 148–50, 151–53. On August 17, 2012, Plaintiff had a hearing before Administrative Law Judge Peggy McFadden-Elmore ("ALJ McFadden-Elmore"). Tr. at 35–65 (Hr'g Tr.). ALJ McFadden-Elmore issued a partially-favorable decision on November 8, 2012, finding that Plaintiff became disabled on August 13, 2012. Tr. at 115–33. Plaintiff filed a request for review with the Appeals Council, and the Appeals Council remanded the claim for another hearing. Tr. at 134–37. A second hearing was held before Administrative Law Judge Ronald Fleming ("ALJ Fleming") on November 6, 2013. Tr. at 66–97 (Hr'g Tr.). ALJ Fleming issued an unfavorable decision on December 30, 2013, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 14–34. Subsequently, the Appeals Council denied Plaintiff's request for review, making ALJ Fleming's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–3. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on August 21, 2014. [ECF No. 1].

---

[1] During the hearing, Plaintiff amended his alleged onset date to January 1, 2008. Tr. at 71.

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 51 years old at the time of the hearing. Tr. at 41. He completed the ninth grade. Tr. at 79. His past relevant work ("PRW") was as a forklift operator, a material handler, and a remodeling laborer. Tr. at 56. He alleges he has been unable to work since January 1, 2008. Tr. at 71.

2.    Medical History

Plaintiff presented to Mark A. Roberts, M.D. ("Dr. Roberts"), on December 11, 2007, with a complaint of swelling in his left ear and pain in his middle and left chest. Tr. at 395. He also reported pain on the left side of his face. *Id.* Dr. Roberts assessed a left ear infection, hypertension, hyperlipidemia, and atypical chest pain. Tr. at 397. He prescribed medications and instructed Plaintiff to follow up for fasting lab work in one week. *Id.*

On June 16, 2008, Plaintiff complained to Dr. Roberts of a left earache, a smoker's cough, and pain in his upper back, left shoulder, and neck. Tr. at 461. Dr. Roberts noted cerumen impaction in Plaintiff's left ear and irrigated the ear. Tr. at 463. He recommended Plaintiff discontinue smoking. *Id.*

Plaintiff presented to Allen L. Sloan, M.D. ("Dr. Sloan"), for cervical injections on July 31, 2008.[2] Tr. at 419. Dr. Sloan noted Plaintiff's drug abuse screening test revealed

---

[2] A medical records request dated November 2, 2009, indicates treatment records were requested from Dr. Sloan's office for the period from "07/01/08 TO PRESENT." Tr. at 401. Dr. Sloan's July 31, 2008, treatment note indicates Plaintiff "was last seen in the

no abnormalities. *Id.* Plaintiff indicated his pain was aggravated by overhead work, lifting, carrying, pushing, and pulling. *Id.* Dr. Sloan noted Plaintiff's lumbar spine was unremarkable. *Id.* He observed moderate muscle and tissue loss over Plaintiff's left deltoid and suprascapular area. *Id.* He noted Plaintiff's left paracervical region demonstrated spasticity when palpated or when a needle was engaged. *Id.* He found Plaintiff to have mild weakness in his left shoulder shrug and with vertical rotation and extension in his cervical spine. *Id.* He indicated he was treating Plaintiff for cervical spondylosis and radiculopathy with exacerbation of facet arthropathy; bilateral suprascapular neuropathy, left greater than right, secondary to cervical spondylosis and radiculopathy; post-radiation myeloradiculopathy; and evidence of cervical spondylosis and lumbar spondylosis by MRI scan. *Id.* Dr. Sloan instructed Plaintiff to continue his medications and administered bilateral three-level cervical facet blocks and bilateral suprascapular injections. Tr. at 419–20.

On September 29, 2008, Plaintiff reported to Dr. Sloan that the injection he received in July was very helpful, but that he continued to have shoulder and neck pain aggravated by his daily activities. Tr. at 418. Dr. Sloan observed Plaintiff to have mild difficulty rising from a seated position and mild pain with range of motion ("ROM") of the cervical spine and left suprascapular ridge. *Id.* He indicated Plaintiff should continue his current medications and follow up in a month for injections. *Id.*

---

office on 3 June 2008." Tr. at 420. In light of this information, it appears that Plaintiff's treatment history with Dr. Sloan predates the record.

Plaintiff visited Dr. Sloan for cervical facet injections on October 29, 2008. Tr. at 416. He indicated the medications and injections had helped to reduce his pain and increase his activity level. *Id.* He endorsed pain and weakness in his mid and lower neck and left shoulder, which were aggravated by most activities of daily living. *Id.* Upon examination, Plaintiff's lumbar spine was unremarkable. *Id.* He had notable loss of muscle and bulk in his upper trapezius and deltoid and in the left side of the sternomastoid posteriorly. *Id.* Plaintiff's upper back was sensitive to touch, and Dr. Sloan noted tenderness throughout Plaintiff's cervical spine. *Id.* Dr. Sloan indicated bilateral suprascapular neuropathy had produced notable tenderness in Plaintiff's suprascapular ridge, radiating into the areas served by that nerve. *Id.* He administered C3-4, C4-5, and C5-6 cervical facet and bilateral suprascapular injections. *Id.*

On November 25, 2008, Plaintiff indicated to Dr. Sloan that the last injections were very helpful. Tr. at 415. Dr. Sloan observed Plaintiff to have a mild degree of difficulty rising from a seated position. *Id.* He indicated Plaintiff had mild pain with ROM of the cervical spine and was less tender in his suprascapular ridges. *Id.*

On December 29, 2008, Dr. Sloan noted that Plaintiff gained weight over the holidays. Tr. at 414. He indicated Plaintiff had moderate difficulty rising from a seated position and complained of pain in his suprascapular ridges. *Id.* He recommended Plaintiff continue his current medications and watch his diet and prescribed Adipex for weight loss. *Id.*

On December 30, 2008, Plaintiff presented to Dr. Roberts for medication refills and reported left ear pain and a cough. Tr. at 465. Dr. Roberts assessed wheezing, left ear

5

infection, hypertension, chronic obstructive pulmonary disease ("COPD"), hyperlipidemia, obesity, and nicotine dependence. Tr. at 467. He prescribed medications and instructed Plaintiff to abstain from smoking and to exercise. *Id.*

Plaintiff followed up with Dr. Sloan on January 27, 2009, for a cervical injection. Tr. at 412. Dr. Sloan indicated "[o]verall, the injections on a periodic basis with his daily medications have been very effective in controlling pain and improving his functionality so that he is able to take care of himself and his family to a greater extent." *Id.* He noted Plaintiff's lumbar exam to be unremarkable. *Id.* However, examination of Plaintiff's cervical and thoracic areas revealed extensive muscle loss in the left superior trapezius region, which Dr. Sloan related to radiation necrosis. *Id.* Dr. Sloan indicated Plaintiff had palpable tenderness over multiple cervical facets and the suprascapular ridges bilaterally. *Id.* He indicated Plaintiff's pain was greater with vertical extension and rotation than with forward flexion. *Id.* Plaintiff received bilateral three-level cervical facet blocks and bilateral suprascapular injections. Tr. at 412–13.

On February 24, 2009, Dr. Sloan indicated Plaintiff was attempting to lose weight to alleviate some of the pressure from his spine and had lost approximately nine pounds since his last visit. Tr. at 411. Plaintiff indicated the medications helped to manage his pain. *Id.* Dr. Sloan observed Plaintiff to have mild difficulty rising from a seated position, but to have less pain with ROM of his cervical spine and no other abnormal physical findings. *Id.*

Plaintiff followed up with Dr. Sloan on March 24, 2009. Tr. at 410. Dr. Sloan noted Plaintiff was using his medications correctly with no untoward side effects and had

lost four pounds over the prior month. *Id.* He observed Plaintiff to have a mild to moderate degree of difficulty when standing from a seated position. *Id.* Plaintiff had pain with ROM of the left shoulder and cervical spine, but demonstrated no other abnormal physical findings. *Id.*

On May 9, 2009, Plaintiff reported to Dr. Sloan that he had been unable to obtain his medications and injections because he had lost Medicaid for a month. Tr. at 409. Dr. Sloan observed Plaintiff to be ambulatory with mild difficulty standing from a seated position. *Id.* He indicated Plaintiff was taking his medications as directed and denied untoward side effects. *Id.* Plaintiff endorsed mild pain with ROM of his cervical spine. *Id.* Dr. Sloan observed Plaintiff to be tender in his left suprascapular ridge, but to have no other abnormal physical findings. *Id.* He indicated Plaintiff should continue his medications and follow up for an injection in May. *Id.*

Plaintiff returned to Dr. Sloan on May 21, 2009, for lumbar injective treatment. Tr. at 407. Dr. Sloan indicated "[p]eriodic injections of this nature along with his oral medications have enabled him to maintain functionality and help with control of his pain for quite some time at this point." *Id.* He stated Plaintiff had been using his medications appropriately and had no untoward side effects. *Id.* Dr. Sloan indicated Plaintiff had a history of cancer that was radiated extensively in the left paracervical region and resulted in extensive radiation loss of tissue and increased pain from a post-radiation myeloradiculopathy. *Id.* He stated "[t]his affects the left side of his posterior neck worse than the right along with extensive loss of tissue from local excision in the left deltoid and trapezius region." *Id.* Dr. Sloan observed Plaintiff's lumbar examination to be

7

unremarkable. *Id.* He noted a vast difference in muscle and bulk over Plaintiff's left suprascapular and scapular region as opposed to the right. *Id.* He indicated Plaintiff's right scapula, deltoid, and trapezius muscles were painful to touch, but were intact. *Id.* Plaintiff was tender to palpation over multiple cervical facets and the suprascapular ridges bilaterally. *Id.* He demonstrated pain with extension of his neck. *Id.* Dr. Sloan instructed Plaintiff to continue his current medications and administered bilateral three-level cervical facet blocks and bilateral suprascapular injections. Tr. at 407–08.

Plaintiff presented to Dr. Roberts for routine follow up on June 4, 2009. Tr. at 470. Dr. Roberts noted Plaintiff continued to smoke and to have a cough. *Id.* He indicated Plaintiff denied myalgias on Vytorin and had no localized soft tissue swelling in his extremities. *Id.* He refilled Plaintiff's medications and indicated Plaintiff would return for fasting blood work. Tr. at 472.

On July 6, 2009, Plaintiff reported to Dr. Sloan that the injections were helpful and that he had been swimming for exercise and had lost five pounds. Tr. at 406. Dr. Sloan indicated Plaintiff was taking his medications appropriately and had no untoward side effects. *Id.* Dr. Sloan observed Plaintiff to be ambulatory, but to have a mild degree of difficulty standing from a seated position. *Id.* He stated Plaintiff had less pain with ROM of the cervical spine and had no other abnormal findings. *Id.* He instructed Plaintiff to continue his current medications and to follow up in one month. *Id.*

Plaintiff returned to Dr. Sloan on September 4, 2009, for a cervical facet block. Tr. at 404. Dr. Sloan indicated periodic injections helped Plaintiff to reduce pain and maintain function. *Id.* Dr. Sloan observed Plaintiff to have negative Lhermitte's and

Spurling's sign. *Id.* Plaintiff had intrinsic neck pain with vertical extension more than forward flexion and palpable tenderness over the cervical facets bilaterally at the lower levels between C3 and C6, somewhat greater on the left than on the right. *Id.* Dr. Sloan noted Plaintiff to have palpable tenderness over each suprascapular notch that reproduced pain in the shoulder and shoulder blade. *Id.* He indicated Plaintiff should continue his current medications and administered bilateral cervical facet injections and bilateral suprascapular injections at C3-4, C4-5, and C5-6. Tr. at 405.

Plaintiff followed up with Dr. Sloan in October 2009. Tr. at 403. He reported the cervical facet blocks and suprascapular injections administered at the prior visit were beneficial. *Id.* Dr. Sloan indicated Plaintiff had no new medical issues and was taking his medications appropriately without any untoward side effects. *Id.* Dr. Sloan indicated Plaintiff should continue his current medications and follow up in two months for another injection. *Id.*

On January 15, 2010, Plaintiff presented to John A. Nicholson, M.D. ("Dr. Nicholson") for a comprehensive orthopedic evaluation at the request of the South Carolina Vocational Rehabilitation Department. Tr. at 422. Dr. Nicholson observed Plaintiff to be morbidly obese and to have "marked pain behaviors with range of motion of every joint tested." Tr. at 423. Plaintiff demonstrated marked head-forward posture while sitting. Tr. at 423. He had slightly flattened lumbar lordosis and reduced ROM of his lumbar spine. Tr. at 423, 425. Dr. Nicholson indicated Plaintiff's cervical ROM was markedly limited in extension and moderately limited in lateral flexion. *Id.* Plaintiff demonstrated reduced ROM in his bilateral shoulders, which was worse on the left than

9

on the right. Tr. at 425. The straight-leg raising test was positive. Tr. at 423, 425. Plaintiff's ROM in his distal upper and lower limbs was within normal limits, but he demonstrated considerable pain behavior. Tr. at 423. Dr. Nicholson found Plaintiff's manual muscle testing to be quite limited secondary to pain and decreased exertion. *Id.* Plaintiff's grip strength was 2–3/5 bilaterally. *Id.* His limb strength was 4-/5 bilaterally. *Id.* Plaintiff had normal bilateral patellar reflexes, but only trace Achilles reflexes. *Id.* His gait was slow and antalgic. *Id.* He was able to able to perform a tandem walk, but tended to lose his balance. *Id.* He was unable to perform toe walking, but could perform heel walking. *Id.* He could squat to about 80 degrees of knee flexion. *Id.* He demonstrated no muscular wasting or atrophy. *Id.* Dr. Nicholson assessed cervicalgia, lumbago, and muscle spasm. Tr. at 423–24.

An x-ray of Plaintiff's cervical spine on February 19, 2010, indicated mild degenerative changes in the cervical spine and calcifications in the soft tissues of his left neck, which suggested carotid arterial disease. Tr. at 428. An x-ray of Plaintiff's lumbar spine also indicated mild degenerative changes. Tr. at 429.

Plaintiff followed up with Marolyn Baril, MN, FNP ("Ms. Baril"), in Dr. Roberts' office on March 18, 2010. Tr. at 474. Plaintiff complained of neck stiffness, swollen glands, and shoulder pain that he rated as a nine on a 10-point scale. *Id.* Plaintiff indicated he took medications and received injections for his shoulder pain, but that the injections typically wore off after 10 days. *Id.* He complained of feeling tired and experiencing shortness of breath. *Id.* Ms. Baril observed Plaintiff to have a decrease in breath sounds, wheezing, prolonged expiratory time, and decreased expiratory force. Tr.

at 475. She also noted Plaintiff had 2+ edema in his leg and ankle and pedal edema. Tr. at 476. Ms. Baril indicated she had a long conversation with Plaintiff regarding abstinence from smoking. *Id.* She prescribed new medications and encouraged Plaintiff to follow a diet and to exercise. *Id.*

On March 25, 2010, state agency medical consultant Richard Weymouth, M.D. ("Dr. Weymouth"), reviewed the record and completed a physical residual functional capacity ("RFC") assessment. Tr. at 430–37.

Plaintiff followed up with Ms. Baril on April 20, 2010, regarding his blood pressure and lab work. Tr. at 478. Ms. Baril observed Plaintiff to have prolonged expiration and scattered expiratory wheezes, particularly in the left lung, but fairly good airflow throughout both lungs. Tr. at 479. Ms. Baril refilled Plaintiff's medications and referred him for lab work. Tr. at 480–81.

Plaintiff presented to James L. Bland, M.D. ("Dr. Bland"), as a new patient on July 13, 2010. Tr. at 445. Plaintiff indicated he was no longer able to remodel mobile homes because of pain in his neck, shoulder, and back. *Id.* Dr. Bland indicated Plaintiff last saw Dr. Sloan in April 2010.[3] *Id.* Plaintiff stated he had not taken pain medications in three months. *Id.* Dr. Bland indicated he would get medical records from Dr. Sloan and wrote "told if we find in future visits evid of Cocaine or Marijuana He will be discharged." *Id.*

---

[3] Dr. Bland's handwritten notes are difficult to decipher, but it appears that he indicated Plaintiff stopped seeing Dr. Sloan due "to Cocaine & Marijuana." *See* Tr. at 445.

An x-ray of Plaintiff's cervical spine on July 30, 2010, indicated no significant findings. Tr. at 441. Plaintiff followed up with Dr. Bland to discuss the x-ray on August 12, 2010. Tr. at 444. He referred Plaintiff for bilateral carotid Doppler studies. *Id.*

Plaintiff followed up with Ms. Baril on August 20, 2010. Tr. at 482. He reported tiring easily, left neck pain and muscle tightness, dyspnea, and orthopnea. *Id.* He complained of pain in his neck, lumbar spine, and knees. Tr. at 483. Ms. Baril observed Plaintiff to have a scattered mild ronchi and decreased breath sounds, but no acute breathing problem. *Id.* Ms. Baril ordered lab work, refilled Plaintiff's medications, and instructed him to follow up in three months. Tr. at 484.

On August 26, 2010, a carotid Doppler ultrasound revealed Plaintiff to have moderate to severe disease in the left common carotid and proximal internal carotid arteries that resulted in 60 to 75 percent stenosis. Tr. at 439. Plaintiff had no Dopplerable flow in the left vertebral artery, which suggested occlusion. *Id.*

Plaintiff returned to Dr. Bland on September 8, 2010, to discuss the ultrasound results and to obtain prescription refills. Tr. at 443. Plaintiff had contacted Dr. Bland's office the day before to report that his feet were swelling and he was experiencing dizziness. Tr. at 450. Dr. Bland indicated diagnoses of COPD, hypertension, GERD, and chronic pain syndrome. Tr. at 443. He referred Plaintiff to a vascular surgeon. *Id.*

Plaintiff presented to Christopher Gates, M.D., on September 17, 2010, for consultation regarding the blockage in his left carotid artery. Tr. at 456. Dr. Gates indicated Plaintiff had developed complete occlusion of his left vertebral artery and stenosis of his left internal carotid artery because of radiation administered 15 years

earlier to treat for left neck pituitary cancer. *Id.* Dr. Gates indicated he was referring Plaintiff for angiograms and that Plaintiff should return after the procedure. *Id.*

Plaintiff underwent angiograms of the cervicocerebral arch and bilateral selective carotids on September 29, 2010. Tr. at 457–58.The tests showed complete occlusion of Plaintiff's left thyrocervical trunk, including the left vertebral artery, and two areas of stenosis in the left common carotid/internal carotid artery with 50 to 60% stenosis in the common carotid and 60 to 70% stenosis of the internal carotid. Tr. at 458. Plaintiff also underwent a Duplex scan of the veins in his lower extremities, which showed no evidence of deep venous thrombosis, mild venous valvular incompetence in the deep system on the right side, and venous valvular incompetence of the left greater saphenous vein. Tr. at 459.

Plaintiff followed up with Dr. Bland on October 7, 2010. Tr. at 531. He indicated to Dr. Bland that he had seen Dr. Gates, who had determined he had a blockage in his left carotid artery. *Id.* Dr. Bland assessed left carotid artery occlusion, COPD, GERD, and neck pain and refilled Plaintiff's medications. *Id.*

On October 22, 2010, Plaintiff underwent a left carotoid endarterectomy. Tr. at 505. Dr. Gates observed Plaintiff to have a significant area of stenosis and significant adhesions and scarring all around the carotid artery from previous surgery and radiation. *Id.*

Plaintiff presented to Dr. Gates for removal of his stitches and surgical staples on November 1, 2010. Tr. at 516. Dr. Gates noted Plaintiff had venous valvular

incompetency and complained of swelling and cramps in his left leg. *Id.* He indicated he would schedule Plaintiff for venous closure. *Id.*

On November 8, 2010, Plaintiff followed up with Dr. Bland for chronic left neck and shoulder pain. Tr. at 532. He indicated his pain had increased and he was taking more Norco than usual. *Id.* Dr. Bland increased Plaintiff's quantity of Norco to 100 tablets per month. *Id.*

Plaintiff presented to Dr. Roberts on November 19, 2010, for routine follow up and medication refills. Tr. at 487. Dr. Roberts indicated Plaintiff was "doing great" following left carotid endarterectomy. *Id.* Plaintiff was wheezing and continued to have a chronic cough, but Dr. Roberts noted that he continued to smoke, as well. Tr. at 488. Dr. Roberts observed Plaintiff to have prolonged expiration and scattered end-expiratory squeaks bilaterally. Tr. at 489. He indicated "HE ABSOLUTELY MUST STOP SMOKING, AND I TOLD HIM SO. HE'S GOT A NICOTINE PATCH, BUT I DON'T THINK HE'S USING IT. I ASKED HIM TO MAKE A SERIOUS EFFORT TO QUIT." *Id.* He continued Plaintiff's current medications and instructed him to follow up in two months. *Id.*

A Doppler carotid scan on November 22, 2010, showed excellent flow in Plaintiff's bilateral carotid arteries and no significant stenosis. Tr. at 508.

Plaintiff presented to Dr. Bland for follow up on December 2, 2010. Tr. at 529. Dr. Bland indicated Plaintiff continued to complain of pain and a "stinging feeling" in the left side of his neck. *Id.* Dr. Bland indicated he would obtain Dr. Gates' records and the Doppler studies and x-rays. *Id.*

On December 16, 2010, Plaintiff underwent radiofrequency obliteration of the left greater saphenous vein. Tr. at 495. He tolerated the procedure well and was discharged to his home following the outpatient surgery. *Id.*

On December 23, 2010, a duplex scan of Plaintiff's lower extremities showed normal flow and closure of the left greater saphenous vein at all levels. Tr. at 507. Dr. Gates indicated Plaintiff was "doing well with no complaints other than a little bit of numbness and tingling in his legs" that did not limit his activities. Tr. at 515. He indicated Plaintiff should follow up as needed. *Id.*

Plaintiff presented to Dr. Bland for monthly follow up on January 3, 2011, and complained of sleep disturbance. Tr. at 528. On February 1, 2011, he followed up with Dr. Bland for cervical pain, COPD, left leg pain, history of left carotid endarterectomy, and prescription refills. Tr. at 527.

State agency medical consultant Frank Ferrell, M.D. ("Dr. Ferrell"), completed a physical RFC assessment on February 25, 2011. Tr. at 517–24.

Plaintiff followed up with Dr. Bland for left leg pain, gastroesophageal reflux disease ("GERD"), left neck pain, and COPD on March 1, 2011. Tr. at 526. Dr. Bland refilled Plaintiff's medications. *Id.* On May 2, Plaintiff presented to Dr. Bland with a severe headache. Tr. at 536. Dr. Bland noted Plaintiff had lost seven-and-a-half pounds. *Id.* He observed tenderness on the left side of Plaintiff's neck and assessed COPD, GERD, muscle pain, anxiety/stress, and arthritis. *Id.* On June 27, Plaintiff followed up with Dr. Bland for a recheck and medication refills. Tr. at 538. Plaintiff complained to Dr. Bland that his left foot was swelling and that he was wheezing on August 30. Tr. at

539. Dr. Bland observed swelling, but only diagnosed "foot pain." *Id.* Plaintiff presented to Dr. Bland for a recheck on October 3, and Dr. Bland noted that he had lost 17 pounds since his August visit. Tr. at 545. A review of systems was within normal limits. *Id.* On November 2, Dr. Bland noted that Plaintiff's wife had recently left him and that his Medicaid coverage was dropped. Tr. at 546. He indicated Plaintiff had lost 11 pounds since his visit the previous month. *Id.* Plaintiff saw Dr. Bland again on November 30, and Dr. Bland indicated he had lost another four pounds. Tr. at 547. Plaintiff indicated he had recently "put up 15 sheets of sheet rock." Tr. at 548.

Plaintiff followed up with Dr. Bland on February 6, 2012, for prescription refills. Tr. at 549. Dr. Bland indicated Plaintiff was stable on his medications and had lost 12 pounds in two months. *Id.* On March 14, Plaintiff complained to Dr. Bland of difficulty sleeping and stated he had a lot of stress in his life. Tr. at 552. Dr. Bland prescribed Exforge 5/160, Valium 10 milligrams, Mobic 15 milligrams, Norco 10/325, Spiriva 18 micrograms, and Advair Diskus 250/50. Tr. at 553. On May 9, Plaintiff informed Dr. Bland that he was unable to afford his prescription for Exforge. Tr. at 556. Dr. Bland indicated Plaintiff's impairments were stable and that he had lost another pound. *Id.* On July 11, Dr. Bland indicated Plaintiff's weight had decreased from 223 pounds to 215 pounds. Tr. at 557. He refilled Plaintiff's medications. *Id.* Plaintiff presented to Dr. Bland on August 13, for follow up and to have paperwork completed for his disability claim. Tr. at 561. He indicated he was unable to afford his blood pressure medication. *Id.* Dr. Bland noted Plaintiff had a history of back, neck, and shoulder pain. *Id.* He completed the disability questionnaire as detailed below. Tr. at 559.

Plaintiff underwent pulmonary function testing at Aiken Regional Medical Center on September 14, 2012. Tr. at 563–66. He gave good effort and his breathing improved after administration of a bronchodilator. Tr. at 563.

On September 15, 2012, Plaintiff presented to Branham Tomarchio, M.D., for a consultative examination.[4] Tr. at 576–80. Dr. Tomarchio noted Plaintiff rose from the waiting room chair slowly and with much difficulty. Tr. at 578. He observed Plaintiff to keep his back straight at all times and his neck bent to the right. *Id.* He indicated Plaintiff's right shoulder was higher than his left. *Id.* Dr. Tomarchio observed Plaintiff to walk with a tight, hunched position and a shuffling gait and to be unstable. *Id.* Plaintiff had an abnormal posture and an obvious muscle spasm. *Id.* Dr. Tomarchio indicated he appeared anxious. *Id.* Plaintiff had a large area of vertical scarring on the left side of his neck and his left cheek was deformed and tight. *Id.* He was tender to palpation over his mid-spine. Tr. at 579. Dr. Tomarchio found Plaintiff to have 5/5 grip strength bilaterally, but he indicated Plaintiff's abilities to perform fine and gross manipulation were impaired because he kept his arms in frozen position to protect his neck and back. *Id.* Plaintiff demonstrated significantly reduced ROM of his cervical spine with flexion reduced from 50 to 10 degrees, extension reduced from 60 to five degrees, lateral flexion reduced from 45 to 10 degrees bilaterally, and rotation reduced from 80 to 20 degrees bilaterally. Tr. at 574. Plaintiff's lumbar ROM was also limited, with flexion reduced from 90 to 25 degrees, extension reduced from 25 to 10 degrees, and lateral flexion reduced from 25 to

---

[4] Following the first hearing, ALJ McFadden-Elmore referred Plaintiff to Dr. Tomarchio for a consultative examination and requested a medical source statement. *See* Tr. at 64, 363–64.

10 degrees. *Id.* His bilateral shoulder ROM was diminished, with abduction reduced from 150 to 40 degrees bilaterally, adduction reduced from 30 to 20 degrees bilaterally, forward elevation reduced from 150 to 120 degrees on the left and 100 degrees on the right, and external rotation reduced from 80 to 20 degrees bilaterally. *Id.* Plaintiff's bilateral elbow supination and pronation were slightly reduced from 80 to 70 degrees. *Id.* His hip ROM was significantly decreased, with abduction reduced from 40 to 25 degrees bilaterally, adduction reduced from 20 to 10 degrees bilaterally, flexion reduced from 100 degrees to 25 degrees on the left and 35 degrees on the right, internal rotation reduced from 40 degrees to 5 degrees on the left and 10 degrees on the right, and extension reduced from 30 degrees to 10 degrees on the left and 20 degrees on the right. *Id.* Straight-leg raising tests were positive in the sitting and supine positions bilaterally. *Id.* Plaintiff demonstrated difficulty performing the tandem walk, heel/toe walk, and squat, and his gait was disturbed. Tr. at 575. Plaintiff had 5/5 muscle strength in the proximal and distal muscle groups of his upper and lower extremities and a grossly intact sensory examination. Tr. at 579. Dr. Tomarchio indicated Plaintiff would have difficulty with activities that involved cervical ROM, such as looking up; the use of fine and gross manipulative skills; sitting, standing, or walking for prolonged periods; and bending, carrying, or lifting. Tr. at 580.

Plaintiff followed up with Dr. Bland on October 8, 2012, for a recheck and to discuss medications. Tr. at 583. Dr. Bland noted Plaintiff had lost eight pounds since August. *Id.* On December 4, Dr. Bland indicated Plaintiff's weight loss might have something to do with his medications. Tr. at 584. He stated it may be necessary to

discontinue a medication if Plaintiff's weight continued to fall. *Id.* Plaintiff followed up with Dr. Bland on March 11, 2013, for a recheck and to discuss medications. Tr. at 585. He continued to complain to Dr. Bland of pain in his left shoulder and on the left side of his neck on May 13, 2013. Tr. at 586. He followed up with Dr. Bland on July 9, 2013, and September 4, 2013, but notes from these visits are generally illegible. *See* Tr. at 587–89.

On November 6, 2013, Dr. Bland wrote a letter in response to Dr. McClure's testimony at the hearing. Tr. at 591. He stated his clinical findings were based on his in-office evaluations, indicated Plaintiff had previously seen Drs. Sloan and Roberts for pain management, and suggested Dr. McClure review his office notes and those of Dr. Sloan more thoroughly. *Id.*

C.    The Administrative Proceedings

1.    August 2012 Administrative Hearing

a.    Plaintiff's Testimony

At the hearing on August 17, 2012, Plaintiff testified he lived alone in a mobile home. Tr. at 41. He stated he was 6'1" tall and weighed 218 pounds after having lost over 60 pounds. *Id.* He testified he had a driver's license and drove up to three times per week. Tr. at 42. He indicated he smoked a pack of cigarettes every two days. Tr. at 43. He denied having worked or received unemployment compensation since January 1, 2008. *Id.*

Plaintiff testified his PRW included full-time work as a heavy equipment operator and a forklift operator and part-time work cleaning out and refurbishing mobile homes. Tr. at 43.

Plaintiff testified he received injections that helped a little, but rarely lasted for more than a week. Tr. at 47. He indicated his pain had worsened since his alleged onset date. Tr. at 48. He endorsed pain in his neck, shoulders, and back and stated he could barely move his neck. *Id.* He indicated he would have difficulty sitting up throughout a day without having his neck supported. Tr. at 49. He stated he could sit for 20 minutes at a time and stand for 20 minutes at a time. Tr. at 51. He testified he could stand and walk for around two hours out of an eight hour workday. Tr. at 54. He indicated he could lift 25 pounds on his right side and about 10 pounds on his left side. Tr. at 51. He testified he had difficulty gripping and holding objects, particularly with his left hand. Tr. at 52.

Plaintiff testified he awoke around 7:30 to 8:00 a.m., but sometimes was unable to sleep during the night. Tr. at 44. He stated he took his medications, watched television, and went back to sleep. Tr. at 45. He indicated his mother and sister did his laundry, brought food to him, did his grocery shopping, and cared for his dog. Tr. at 45–46. He testified he fell asleep before 9:30 each evening, but sometimes awoke with a panic attack during the night. Tr. at 45–46.

b.    Vocational Expert Testimony

Vocational Expert ("VE") Thomas Neil, Ph. D., reviewed the record and testified at the hearing. Tr. at 55–63. The VE categorized Plaintiff's PRW as a forklift operator, *Dictionary of Occupational Titles* ("*DOT*") number 921.683-050, as medium with a

20

specific vocational preparation ("SVP") of three; a material handler, *DOT* number 929.687-030, as heavy with an SVP of three; a grounds keeper, 406.687-010, as medium with an SVP of two; and a remodeling laborer, 869.687-026, as medium to heavy with an SVP of two. Tr. at 56. ALJ McFadden-Elmore described a hypothetical individual of Plaintiff's vocational profile who could lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk about six hours in an eight-hour workday; sit about six hours in an eight-hour workday; never climb ladders, ropes, or scaffolds; and occasionally climb ramps or stairs, balance, stoop, kneel, crouch, and crawl. Tr. at 57. The VE testified that the hypothetical individual would be unable to perform Plaintiff's PRW. *Id.* ALJ McFadden-Elmore asked whether there were any other jobs in the region or national economy that the hypothetical person could perform. *Id.* The VE identified light and unskilled jobs as a commercial cleaner, *DOT* number 323.687-014, with 850 positions in South Carolina and 90,000 positions nationally; a laundry garment bagger, *DOT* number 920.687-018, with 650 positions in South Carolina and 17,000 positions in the national economy; and a dining room attendant, *DOT* number 311.677-010, with 950 positions in South Carolina and 70,000 positions in the national economy. *Id.*

ALJ McFadden-Elmore next asked the VE to assume the hypothetical individual was limited as follows: lift and/or carry 10 pounds occasionally and less than 10 pounds frequently; stand and/or walk at least two hours in an eight-hour workday; sit about six hours in an eight-hour workday; never climb ladders, ropes, or scaffolds; occasionally climb ramps or stairs, balance, stoop, kneel, crouch, and crawl. Tr. at 58. He asked if the hypothetical individual could perform any jobs available in the local or national

economy. *Id.* The VE testified the individual would be able to perform the full range of sedentary, unskilled work and identified specific jobs as a business service operator, *DOT* number 237.367-014, with 1,000 positions in South Carolina and 110,000 positions nationally; an addressing clerk, *DOT* number 209.587-010, with 900 positions in South Carolina and 16,000 positions nationally; and a brake lining coater, *DOT* number 574.685-010, with 550 positions in South Carolina and 25,000 positions nationally. Tr. at 58–59.

For a third hypothetical, ALJ McFadden-Elmore asked the VE to assume an individual of Plaintiff's vocational profile who could lift and/or carry 20 pounds occasionally and less than 10 pounds frequently; stand and/or walk for about six hours in an eight-hour workday; never climb ladders, ropes, or scaffolds; occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; and should avoid concentrated exposure to extreme cold, extreme heat, fumes, odors, dust, gases, and poor ventilation. Tr. at 59. ALJ McFadden-Elmore asked if the hypothetical individual could perform any jobs. *Id.* The VE testified the individual could perform the same jobs identified in response to the first hypothetical question. Tr. at 60.

For a fourth hypothetical question, ALJ McFadden-Elmore asked the VE to assume an individual of Plaintiff's vocational profile who was limited as follows: lift and/or carry 10 pounds occasionally and less than 10 pounds frequently; stand and/or walk about least two hours in an eight-hour workday; sit about six hours in an eight-hour workday; never climb ladders, ropes, or scaffolds; occasionally climb ramps and stairs; balance, stoop, kneel, crouch, and crawl; and avoid concentrated exposure to extreme

22

cold, extreme heat, fumes, odors, dust, gases, and poor ventilation. *Id.* ALJ McFadden-Elmore asked if this individual would be able to perform any work available in the local or national economy. *Id.* The VE testified the same jobs identified in response to the second hypothetical question would be available. Tr. at 61.

For a fifth hypothetical, ALJ McFadden-Elmore asked the VE to consider an individual of Plaintiff's vocational profile with the following limitations: lift and/or carry 10 pounds occasionally and less than 10 pounds frequently; stand and/or walk for less than two hours because of pain; sit for less than six hours because of pain; never climb ladders, ropes, or scaffolds; occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; and avoid concentrated exposure to extreme cold, extreme heat, and fumes. *Id.* ALJ McFadden-Elmore asked if this individual would be able to perform any work available in the local or national economy. *Id.* The VE testified the individual would not be able to perform any jobs because he would not be meeting a normal workday. *Id.*

ALJ McFadden-Elmore asked the VE if his testimony was consistent with the *DOT*, the *Selected Characteristics of Occupations Defined in the Revised Diction of Occupational Titles* ("*SCO*"), and supporting publications. *Id.* The VE stated "[t]o the best of my knowledge." *Id.*

Plaintiff's counsel ("Counsel") asked the VE to assume the individual had problems with grip strength to the point that he was limited to only occasional manipulation with his hands. Tr. at 62. He asked if that would preclude the sedentary jobs identified. *Id.* The VE testified that only one unskilled, sedentary job allowed for

occasional reaching, handling, and fingering. *Id.* He indicated a limitation to occasional use of the hands for reaching, handling, and fingering would have a substantial impact on the sedentary, unskilled occupational base. *Id.*

Counsel next asked the VE to assess the vocational implications of an individual using a head support. *Id.* The VE indicated that use of a head support would present no problem in the workplace as long as the individual was meeting performance standards. *Id.*

Counsel asked the VE whether an individual was expected to maintain a seated position for most of the day in a sedentary job. Tr. at 62. The VE indicated the assumption in the *DOT* was that the individual could sit for six hours out of a normal day. *Id.* He stated the *DOT* did not speak to the sit/stand option. *Id.* He further indicated the normal assumption underlying the *DOT* is that the individual could sit for at least two hours on a continuous basis. *Id.*

2.     November 2013 Administrative Hearing

a.     Plaintiff's Testimony

At the hearing on November 6, 2013, Plaintiff testified he weighed 212 pounds and had lost weight because he was depressed and did not feel like eating. Tr. at 72. He indicated he had a driver's license, but did not drive because he no longer owned a vehicle. Tr. at 79.

Plaintiff testified he had constant pain in his shoulder and neck and occasional pain in his lower back. Tr. at 82–83. He assessed the pain in his lower back as an eight to nine of 10. Tr. at 83. He indicated he took Oxycodone for pain, which provided

temporary relief. *Id.* He stated no doctors had recommended back surgery. *Id.* Plaintiff endorsed taking medication for COPD and using an inhaler. Tr. at 84. He acknowledged that he continued to smoke. *Id.* Plaintiff testified he experienced a tingling sensation in his neck and hands, but denied tingling in his feet and legs. Tr. at 85. He indicated his right hand was fine, but his left hand was weak. Tr. at 90. He testified he recently dropped a gallon of bleach, causing it to break and spill on the floor. *Id.* He stated he was taking medication for anxiety and experienced panic attacks a couple of times per month. Tr. at 85. Counsel questioned Plaintiff about his treatment with Dr. Sloan and Plaintiff indicated Dr. Sloan's treatment provided short-term relief. Tr. at 89.

Plaintiff testified he was unable to work because of his pain. Tr. at 91. He indicated he could not lift, sit, or stand to perform a job. *Id.* He stated he was unable to do anything for too long and needed to lie down. *Id.* Plaintiff indicated he spent six to seven hours lying down during a typical day. *Id.* He stated his medication made him sleepy and caused him to doze off. Tr. at 91–92.

Plaintiff testified he could sit and stand for 10 minutes at a time. Tr. at 86. He indicated he could walk for an eighth to a quarter of a mile. *Id.* He stated he could not carry anything in his left hand, but could carry 10 pounds in his right hand. *Id.* He indicated he could pick up an item off the ground, kneel on one knee, squat, and crawl. *Id.*

Plaintiff testified he microwaved food that his mother prepared and brought to him daily. Tr. at 87. He stated his mother washed his dishes, did his yard work, and vacuumed, mopped, and swept his floors. *Id.* He indicated he did his own laundry. *Id.* He

testified he went with his mother to the grocery store. *Id.* He stated that on a typical morning, he had a cup of coffee, watched television, ate something, and went back to sleep. Tr. at 88. He indicated he took short naps throughout the day and was unable to sleep for more than six hours at night because of his back pain. *Id.*

b.    Medical Expert Testimony

Medical Expert ("ME") Howard McClure, M.D., reviewed the record and testified at the hearing. Tr. at 73–77. ALJ Fleming asked the ME to identify Plaintiff's impairments between January 1, 2008, and December 31, 2011. Tr. at 73. The ME indicated Plaintiff had a left carotid malignancy with surgery and radiation therapy in 1995 that resulted in vocal stuttering and complaints of pain in his face and neck. Tr. at 73–74. He stated Plaintiff had an occlusion of his left vertebral artery and a left carotid endarterectomy without significant neurological loss. Tr. at 74. He indicated Plaintiff had COPD that was not severe. *Id.* He stated Plaintiff had hypertension, but no significant coronary artery disease. *Id.* The ME indicated Plaintiff's impairments did not meet or equal a listed impairment and supported an RFC for the full range of medium work. *Id.*

ALJ Fleming asked the ME to provide an opinion regarding the x-rays of Plaintiff's cervical and lumbar spine. *Id.* The ME classified the changes on x-ray as minor and stated Plaintiff had no evidence of radiculopathy. *Id.*

Counsel questioned the ME about Dr. Sloan's report. Tr. at 75. The ME stated he reviewed Dr. Sloan's report, but did not agree with the diagnosis of right radiculopathy because he did not find an objective test that supported it in the records. *Id.*

Counsel asked the ME if the muscle loss in Plaintiff's left superior area would be expected from the radiation treatment he received. Tr. at 76. The ME testified that it might be expected from the radiation, but did not significantly hamper Plaintiff's activities. *Id.*

Counsel asked the ME about Dr. Tomarchio's indications that Plaintiff had obvious muscle spasm and was limited in his physical abilities. *Id.* The ME indicated there was no objective support for the limitations. *Id.* Counsel asked the ME if limited strength in the hands and straight-leg raising tests provided support for Dr. Tomarchio's opinion. *Id.* The ME indicated it depended on what sort of impairments were found based on those observations and that the specified limitations were not supported by the objective findings. Tr. at 76–77. Counsel asked what objective findings would be necessary to support the limitations identified. Tr. at 77. The ME testified that Dr. Tomarchio would have had to specify which impairments he was talking about. *Id.* Counsel pointed out that Plaintiff was treated for neuropathy, radiculopathy, and muscle lessening. *Id.* The ME testified the limitations did not make sense to him in light of those diagnoses. *Id.*

c.    VE Testimony

VE Mary Cornelius reviewed the record and testified at the hearing. Tr. at 92–95. She classified Plaintiff's PRW as that of a heavy equipment operator, *DOT* number 859.683-010, which is medium and skilled with an SVP of six and a forklift operator, *DOT* number 921.683-050, which is medium and semiskilled with an SVP of three. Tr. at 93. ALJ Fleming asked the VE to consider a hypothetical individual with Plaintiff's

27

vocational profile that was limited to light work with the following restrictions: frequently climbing ramps and stairs and balancing; no climbing of ladders, ropes, or scaffolds, kneeling, crouching, or crawling; occasionally stooping; and must avoid concentrated exposure to fumes, odors, dust, gases, poor ventilation, machinery, and heights. *Id.* He asked if the hypothetical individual could perform any of Plaintiff's PRW. *Id.* The VE testified the individual could not. *Id.* ALJ Fleming asked if there were other jobs for an individual who was limited as described in the hypothetical. *Id.* The VE testified the individual could perform light and unskilled work as a mail sorter, *DOT* number 209.687-026, with 1,600 positions in South Carolina and 100,000 positions nationally; a proofreader helper, *DOT* number 239.667-010, with 1,000 positions in South Carolina and 54,000 positions nationally; and a plumbing assembler, *DOT* number 706.684-086, with 900 positions in South Carolina and 60,000 positions nationally. *Id.*

For a second hypothetical, ALJ Fleming asked the VE to assume the same restrictions in the first hypothetical, but to further assume the individual was limited to occasional handling with the non-dominant upper extremity. Tr. at 93. ALJ Fleming asked if the additional restriction precluded performance of the jobs identified in response to the first hypothetical. Tr. at 94. The VE indicated it did not. *Id.*

For a third hypothetical, ALJ Fleming asked the VE to assume the same restrictions in the second hypothetical, but to assume the individual was limited to sedentary work, would be off task for 20 percent of the workday, and would miss three days of work per month. *Id.* He asked if the hypothetical individual could perform any work. *Id.* The VE testified he could not. *Id.*

28

Counsel asked the VE if a person could perform sedentary work if he was not able to remain in a seated position throughout most of the day. *Id.* The VE testified that if the individual was unable to perform the job tasks, he would not be able to engage in sedentary work. Tr. at 95. Counsel asked if a limitation to no more than two hours of standing and walking daily would limit an individual to sedentary work. *Id.* The VE indicated it would. *Id.* Counsel asked the VE to assume the individual was occasionally limited to fine and gross hand manipulations. *Id.* He asked if the individual could perform sedentary and light jobs in substantial numbers. *Id.* The VE testified the individual could not perform sedentary jobs if he lacked good bilateral handling and fine manipulation. *Id.*

ALJ Fleming asked the VE if her testimony comported with the *DOT*. *Id.* She indicated it did. *Id.*

### 3.    ALJ Fleming's Findings

In his decision dated December 30, 2013, ALJ Fleming made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2011.
2.    The claimant has not engaged in substantial gainful activity since January 1, 2008, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).
3.    The claimant has the following severe impairments: status post left carotid endarterectomy secondary to parotid gland tumor with removal and radiation and chemotherapy; chronic obstructive pulmonary disorder (COPD); status post closure of the greater saphenous vein; neuropathy; degenerative disc disease of the lumbar and cervical spine (20 CFR 404.1520(c) and 416.920(c)).
4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except: he can only occasionally climb ramps and stairs; he can never climb ladders, ropes, or scaffolds; he can frequently balance; he can only occasionally stoop; he can never kneel, crouch, or crawl; he should avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, machinery, and heights; he can only occasionally handle with the left upper extremity.

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.    The claimant was born on September 28, 1960 and was 47 years old, which is defined as a younger individual age 18–49, on the amended alleged disability onset date. The claimant subsequently changed age category to closely approaching advanced age (20 CFR 404.1563 and 416.963).

8.    The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.    Transferability of job skills is not material to the determination of disability because applying the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, 416.969(a)).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from January 1, 2008, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. at 20–28.

D.    Appeals Council Review

1.    July 9, 2013

The Appeals Council issued an order remanding the case to an ALJ on July 9, 2013. Tr. at 134–36. It indicated it granted the request for review under the substantial evidence provision of the Social Security Administration's ("SSA's") regulations. Tr. at 135. It stated its order vacated the hearing decision and remanded the case to an ALJ to

determine whether Plaintiff was disabled prior to his date last insured.[5] *Id.* The order instructed the ALJ to obtain evidence from a medical expert; to give further consideration to the claimant's maximum RFC, if necessary; and to obtain supplemental evidence from a VE, if warranted by the expanded record. Tr. at 136.

>           2.       June 18, 2014

On June 18, 2014, the Appeals Council issued a notice denying Plaintiff's request for review. Tr. at 1–3.

## II.    Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

>   1)      ALJ Fleming neglected to address the prior ALJ's findings and determination;
>
>   2)      ALJ Fleming did not adequately evaluate the opinion evidence; and
>
>   3)      ALJ Fleming ignored conflicts between the VE's testimony and the *DOT*.

The Commissioner counters that substantial evidence supports ALJ Fleming's findings and argues ALJ Fleming committed no legal error in his decision.

---

[5] The Appeals Council noted that ALJ McFadden-Elmore found Plaintiff to have sufficient quarters of coverage to remain insured through December 31, 2012, but the SSA's queries indicated Plaintiff was only insured for benefits through December 31, 2011. Tr. at 135. Because ALJ McFadden-Elmore found Plaintiff disabled on August 13, 2012, the change in date last insured meant Plaintiff was no longer insured for DIB on the date ALJ McFadden-Elmore found him disabled.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[6] (4) whether such

---

[6] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. §§ 404.1525, 416.925. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria."  20 C.F.R. §§ 404.1526, 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146

impairment prevents claimant from performing PRW;[7] and (5) whether the impairment prevents him from doing substantial gainful employment. *See* 20 C.F.R. §§ 404.1520, 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. §§ 404.1520(a)(4), 416.920 (a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, §§ 404.1520(a), (b), 416.920(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v.*

---

(1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[7] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. §§ 404.1520(h), 416.920(h).

*Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party."  42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*; *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence."  *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is

substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.     Analysis

1.     Prior ALJ Determination

In a partially-favorable decision dated November 8, 2012, ALJ McFadden-Elmore made the following findings of fact and conclusions of law:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2012.
2.  The claimant has not engaged in substantial gainful activity since the alleged onset date, as amended (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).
3.  Since the amended alleged onset date of disability, January 1, 2008, the claimant has had the following severe impairments: degenerative disc disease of the cervical and lumbar spines, neck pain, back pain, and shoulder pain. Beginning on the established onset date of disability, August 13, 2012, the claimant has had the following severe impairments: degenerative disc disease of the cervical and lumbar spines, neck pain, back pain, shoulder pain, and chronic obstructive pulmonary disease (COPD) (20 CFR 404.1520(c) and 416.920(c)).
4.  Since the alleged onset date of disability, as amended, January 1, 2008, the claimant has not had an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).
5.  After careful consideration of the entire record, I find that prior to August 13, 2012, the date the claimant became disabled, the claimant had the residual functional capacity to perform a range of light work as defined in 20 CFR 404.1567(b) and 416.967(b) in that he could lift and carry no more than twenty pounds occasionally and ten pounds frequently; stand and walk for about six hours in a workday; and sit for about six hours in a workday. He could occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs, but never climb ladders, ropes, and scaffolds.
6.  After careful consideration of the entire record, I find that beginning on August 13, 2012, the claimant has the residual functional capacity to

perform the exertional requirements of no more than the full range of sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a).

7. Since January 1, 2008, the claimant has been unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

8. Prior to the established disability onset date, the claimant was a younger individual age 18–49. Since the established disability onset date, the claimant's age category has changed to an individual closely approaching advanced age (20 CFR 404.1563 and 416.963).

9. The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

10. Prior to August 13, 2012, transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled" whether or not the claimant has transferable job skills. Beginning on August 13, 2012, the claimant has not been able to transfer job skills to other occupations (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

11. Prior to August 13, 2012, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

12. Beginning on August 13, 2012, considering the claimant's age, education, work experience, and residual functional capacity, there are no jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

13. The claimant was not disabled prior to August 13, 2012, but became disabled on that date and has continued to be disabled through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. at 121–28.

Plaintiff argues ALJ Fleming neglected to reconcile or even address his reasons for deviating from ALJ McFadden-Elmore's findings. [ECF No. 17 at 20–24]. He maintains ALJ Fleming neglected to follow the mandates of Acquiescence Ruling ("AR") 00-1(4) and the Fourth Circuit's decision in *Albright v. Commissioner of the Social Security Administration*, 174 F.3d 473 (4th Cir. 1999). *Id.* at 21–22. Although Plaintiff acknowledges ALJ McFadden-Elmore's decision was not administratively final, he argues that ALJ Fleming could not reject the prior decision unless substantial evidence

supported such a decision. *Id.* at 23. Finally, he argues that substantial evidence did not support ALJ's Fleming's rejection of the prior decision because he failed to provide any explanation for his deviation from ALJ McFadden-Elmore's findings. *Id.*

The Commissioner argues the only applicable test is whether substantial evidence supports her final decision. [ECF No. 19 at 7]. She maintains that the holding in *Albright* and the policy articulated in AR 00-1(4) are not applicable because the prior ALJ's decision was not the Commissioner's final decision. *Id.* at 8. She also contends that even if *Albright* and AR 00-1(4) applied here, the findings by both ALJs did not violate the concern over consistency articulated in *Albright* in that both ALJs found Plaintiff was not disabled before the expiration of his insured status. *Id.*

The Fourth Circuit issued *Albright* in response to the SSA's AR 94-2(4) that prevented claimants in the Fourth Circuit from obtaining benefits on second and subsequent applications unless they could "produce new and material evidence" that their impairments increased in severity from the date of a prior unfavorable final determination. *Albright*, 174 F.3d at 475. In striking down the ruling, the court explained that the ruling "operates to mechanistically merge two claims into one" and "carves out an exception to the general rule that separate claims are to be considered separately." *Id.* at 476. In *Albright*, the court explained that AR 94-2(4) was promulgated following the court's ruling in *Lively v. Secretary of Health and Human Services*, 820 F.2d 1391 (4th Cir. 1987). In striking down AR 94-2(4), the court stated *Lively* was "best understood as a practical application of the substantial evidence rule." *Albright*, 174 F.3d at 477. It expounded as follows:

> [W]e determined that the finding of a qualified and disinterested tribunal that Lively was capable of performing only light work as of a certain date was such an important and probative fact as to render the subsequent finding to the contrary unsupported by substantial evidence. To have held otherwise would have thwarted the legitimate expectations of claimants—and, indeed, society at large—that final agency adjudications should carry considerable weight. Even more importantly, judicial ratification of the SSA's 'bait-and-switch' approach to resolving Lively's claim would have produced a result reasonably perceived as unjust and fundamentally unfair.

*Id.* at 477–78.

Following the Fourth Circuit's decision in *Albright*, the SSA issued AR 00-1(4), which interpreted *Albright* "to hold that where a final decision of SSA after a hearing on a prior disability claim contains a finding required at a step in the sequential evaluation process for determining disability, SSA must consider such finding as evidence and give it appropriate weight in light of all relevant facts and circumstances when adjudicating a subsequent claim involving an unadjudicated period." 2000 WL 43774, at *4. Pursuant to AR 00-1(4), the ALJ must consider the following factors:

> (1) whether the fact on which the prior finding was based is subject to change with the passage of time, such as a fact relating to the severity of a claimant's medical condition; (2) the likelihood of such a change, considering the length of time that has elapsed between the period previously adjudicated and the period being adjudicated in the subsequent claim; and (3) the extent that evidence not considered in the final decision on the prior claim provides a basis for making a different finding with respect to the period being adjudicated in the subsequent claim.

The undersigned's research indicates neither this court nor the Fourth Circuit have addressed whether ALJs must follow the directives of *Albright* and AR 00-1(4) when considering prior ALJ decisions that were vacated by the Appeals Council. Most of the lower courts that have addressed the issued have held that *Albright* and AR 00-1(4) do

not apply because the prior ALJs' decisions were not the agency's final decisions. In *Batson v. Colvin*, 2015 WL 1000791, at *7 (E.D.N.C. Mar. 5, 2015), the court held that "*Albright* did not require the second ALJ to consider the first ALJ's decision because that decision had been vacated, and thus no finding remained to be considered in the subsequent determination." The court cited *Monroe v. Colvin*, C/A No.: 7:13-74-FL, 2014 WL 7404136, at *2 (E.D.N.C. Dec. 30, 2014), in which the court stated "[c]ontrary to plaintiff's argument, however, the ALJ was not required to give weight to the findings made in the 2010 decision, because it was vacated and not the final agency decision of the Commissioner," and *Williams v. Colvin*, C/A No. 7:12-242, 2013 WL 5151797, at *4 (W.D. Va. Sept. 13, 2013), in which the court stated "both of the prior ALJ decision in this case were vacated, and thus there was no 'prior finding' to be afforded any weight under SSAR 00-1(4)." *Batson*, 2015 WL 1000791, at *7. However, the court in *Batson* acknowledged a contrary finding from the Middle District of North Carolina, which rejected "the argument that the rule of *Albright* and *Lively* does not apply to prior decisions vacated by the Appeals Council." *Id.*, citing *Bordwell v. Colvin*, C/A No. 1:11-1096-TWB-LPA, 2013 WL 5151791, at *4 (M.D.N.C. July 24, 2014). Most recently, in *Myers v. Colvin*, C/A No. 1:13-898, 2015 WL 4366201, at *3 n.4 (M.D.N.C. July 16, 2015), the court indicated in a footnote that the ALJ was not required to give weight to the prior ALJ's findings because that decision had been vacated by the Appeals Council. Thus, the case law weighs in favor of a finding that the holding in *Albright* and AR 00-1(4) apply only to the Commissioner's final decisions and are inapplicable when the

Appeals Council vacates a prior ALJ's decision, but this court is not bound by the findings of any of the courts that have addressed the matter.

Courts that have addressed AR 00-1(4)'s requirements in the context of final decisions have generally found that ALJs were not required to explicitly discuss and weigh the decisions of prior ALJs. In *Harris v. Astrue*, C/A No. 2:12-45, 2013 WL 1187151, at *8, (N.D. W. Va. Mar. 21, 2013), the court held that "[a]lthough the ALJ did not specifically cite to AR 00-1(4) or his prior ruling in his April 2010 decision," several factors suggested he had weighed the opinion in accordance with AR 00-1(4), including inclusion of his prior decision in the list of exhibits attached to the decision at issue and the presence of more favorable findings at steps two and three than in his prior decision. The plaintiff argued the ALJ was required to explicitly state the weight assigned to his prior decision, but the court indicated "AR 00-1(4) does not impose such a burden upon the ALJ; AR 00-1(4) merely states that the ALJ shall consider and weigh the prior ruling as evidence in reaching his decision in the second claim." *Harris*, 2013 WL 1187151, at *8; *see also McKay v. Colvin*, C/A No. 3:12-1601, 2013 WL 3282928, at *13 (S.D. W. Va. Jun. 27, 2013) ("AR 00-1(4) requires the ALJ to consider and weigh the prior decision as evidence, but does not impose a burden on the ALJ to explicitly state the weight he assigned to this evidence."). *In Melvin v. Astrue*, 602 F. Supp. 2d 694, 702 (E.D.N.C. 2009), the court found that, although the ALJ did not specifically refer to AR 00-1(4) or explain the precise weight he gave the prior ALJ's findings, he complied with SSR 00-1(4) and *Albright* because he "did mention claimant's prior attempts to get benefits (including the August 20, 2001 denial) and did not invoke res judicata." The

court explained the ALJ evaluated the whole record, applied the governing legal standard, and denied plaintiff's claim. *Melvin*, 602 F. Supp. 2d at 702.

Although *Albright* and AR 00-1(4) have generally been interpreted to not require ALJs to explicitly weigh prior ALJs' decisions, this court has indicated substantial evidence must support the weight ALJs give to those decisions. In *Rowell v. Astrue*, 2012 WL 5873824 (D.S.C. Nov. 2, 2012), this court found that substantial evidence did not support the ALJ's treatment of the prior ALJ's decision. The court wrote "[a]lthough AR 00-1(4) does not appear to require that the ALJ specifically discuss each of the three factors outlined above, it is unclear from the ALJ's conclusory statement why he concluded that Plaintiff's condition did not decline after the April 2005 decision." *Rowell*, 2012 WL 5873824, at *8. However, in *Rivers v. Colvin*, C/A No. 9:12-2558-MGL, 2014 WL 1094616 (D.S.C. Mar. 19, 2014), the court determined substantial evidence supported the ALJ's treatment of the prior ALJ's findings. The court noted "[t]he ALJ's review of the medical evidence of record, including the records from the previously adjudicated period, demonstrates that she complied with AR 00-1(4) and *Albright*." *Rivers*, 2014 WL 1094616, at *4.

In view of the foregoing, the undersigned recommends the court find ALJ Fleming did not err in his consideration of the prior ALJ's decision. Because the Appeals Council vacated ALJ McFadden-Elmore's decision, her decision was not a final determination. The majority of the non-binding case law suggests that *Albright* and AR 00-1(4) require no consideration of the prior ALJ's decision under these circumstances. However, because neither this court nor the Fourth Circuit has addressed this specific issue, the

undersigned proceeds to examine whether ALJ Fleming adequately considered ALJ McFadden-Elmore's findings and whether his decision to deviate from her findings was supported by substantial evidence. The undersigned notes that ALJ Fleming discussed the procedural history and acknowledged that ALJ McFadden-Elmore "determined the claimant had an established onset date of August 13, 2012" and "awarded both Title II and XVI benefits as of that date." *See* Tr. at 17. Here, as in *Harris*, the exhibit list attached to ALJ Fleming's decision indicates ALJ McFadden-Elmore's decision was in the record he reviewed. *See* Tr. at 29. Also, as in *Melvin*, ALJ Fleming discussed the prior finding in his recitation of the procedural history. Therefore, the undersigned concludes that ALJ Fleming considered ALJ McFadden-Elmore's decision.

Although ALJ Fleming did not explicitly discuss his reasons for rejecting some of ALJ McFadden-Elmore's findings, his decision and the record as a whole reveal that he reached a different conclusion based on additional evidence not available to ALJ McFadden-Elmore. The Appeals Council remanded the case with specific instructions for the ALJ to obtain evidence from an ME, reconsider Plaintiff's maximum RFC, and obtain additional VE testimony. Tr. at 136. In accordance with the Appeals' Council's directives, ALJ Fleming obtained testimony from an ME. Tr. at 73–77.  Also in accordance with the directives of the Appeals Council, ALJ Fleming reconsidered Plaintiff's maximum RFC in light of all the evidence and found that the ME's opinion, in combination with the opinions of the consultative examiners and state agency medical consultants, supported a finding that Plaintiff had a maximum RFC to perform light work. *See* Tr. at 26. Finally, ALJ Fleming followed the Appeals Council's third directive

42

in obtaining additional VE testimony that indicated an individual with the maximum RFC he assessed could perform jobs that existed in significant numbers in the economy. Tr. at 93.

Pursuant to SSR 00-1(4), one of the factors to be considered in determining how much weight to give to a prior ALJ's decision is "the extent that evidence not considered in the final decision on the prior claim provides a basis for making a different finding with respect to the period being adjudicated in the subsequent claim." The record before ALJ Fleming contained additional evidence from Dr. McClure, who testified that Plaintiff had a maximum RFC to perform the full range of medium work and indicated the diagnoses made by Dr. Sloan and the restrictions set forth by Dr. Tomarchio were not supported by the objective findings in the record. *See* Tr. at 74–77. Where, as here, additional and conflicting evidence is made part of the record after a prior ALJ's finding, it is reasonable for the new ALJ to make different findings and reach a conclusion contrary to that of the prior ALJ. In light of the new evidence, which raised suspicion regarding the validity of the diagnoses and restrictions relied upon by ALJ McFadden-Elmore and provided a new opinion that Plaintiff could perform medium work, the undersigned finds ALJ Fleming adequately weighed and rejected ALJ McFadden-Elmore's findings in accordance with *Albright* and AR 00-1(4).

2.     Evaluation of Opinion Evidence

Plaintiff argues ALJ Fleming failed to evaluate the opinion evidence as required by 20 C.F.R. § 404.1527(c), SSR 96-2p, and SSR 96-5p. [ECF No. 17 at 24–36]. The

Commissioner maintains ALJ Fleming adequately evaluated the opinion evidence. [ECF No. 19 at 10–15].

SSA's rules mandate that ALJs consider all medical opinions in the record and dictate specific factors that must be weighed in evaluating opinion evidence. 20 C.F.R. § 416.927(b), (c). If the record contains the opinion of a claimant's treating physician, that opinion is presumed to carry controlling weight as long as it is well-supported by medically-acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). However, if a treating physician's opinion is not well-supported by medically-acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record, it may still be entitled to deference and should be weighed based on the factors set forth in 20 C.F.R. §§ 404.1527(c)(2)–(6) and 416.927(c)(2)–(6). 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); SSR 96-2p. If the record contains no treating physician's opinion or if the ALJ declines to give the treating physician's opinion controlling weight, all of the medical opinions in the record must be weighed based upon the following factors: (1) the examining relationship between the claimant and the medical provider; (2) the treatment relationship between the claimant and the medical provider, including the length of the treatment relationship and frequency of treatment and the nature and extent of the treatment relationship; (3) the supportability of the medical provider's opinion in his or her own treatment records; (4) the consistency of the medical opinion with other evidence in the record; and (5) the specialization of the medical provider offering the opinion. *Johnson*, 434 F.3d at 654; 20 C.F.R. § 416.927(c).

The SSA's rulings and regulations specifically guide ALJs in considering the relevant factors to determine the weight to be accorded to the medical opinion evidence. 20 C.F.R. §§ 404.1527(c), 416.927(c). They provide that even if a treating physician's opinion is not accorded controlling weight, it should generally carry more weight than any other opinion evidence in the record. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). However, the Fourth Circuit has indicated "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001), citing *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992). The regulations specify that opinions from examining medical sources typically carry more weight than those from non-examining sources, such as state agency medical and psychological consultants and medical experts who testify at hearings. *Morgan v. Barnhart*, 142 F. App'x 716, 727 (4th Cir. 2005); 20 C.F.R. § 416.927(c)(1). However, ALJs may rely upon the opinions of non-examining physicians when their opinions are "consistent with the record." *Tanner v. Commissioner of Social Sec.*, 602 F. App'x 95, 101 (4th Cir. 2015), citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986). Conversely, "a non-examining physician's opinion cannot, by itself, serve as substantial evidence supporting a denial of disability benefits when it is contradicted by all of the other evidence in the record." *Smith*, 795 F.2d at 345. The regulations state that medical opinions that are supported by medical signs and laboratory findings and adequately explained deserve more weight than unsupported and unexplained opinions. 20 C.F.R. § 416.927(c)(3). They provide that medical opinions that are consistent with the entire record carry more weight than those that are not. 20 C.F.R.

§§ 404.1527(c)(4), 416.927(c)(4); *Stanley v. Barnhart*, 116 F. App'x 427, 429 (4th Cir. 2004) ("The medical source opinion regulations indicate that the more consistent an opinion is with the record as a whole, the more weight the Commissioner will give it."). The regulations stipulate that ALJs should accord greater weight to opinions from specialists that address medical issues related to their areas of specialty. 20 C.F.R. § 416.927(c)(5). Finally, ALJs should consider any additional factors that tend to support or contradict medical opinions in the record. 20 C.F.R. § 416.927(c)(6).

In view of the foregoing authority, the undersigned considers ALJ Fleming's treatment of the opinion evidence of record.

### a.     Dr. Bland's Opinion

On August 13, 2012, Dr. Bland indicated Plaintiff was limited as follows: unable to engage in greater than part-time work activity; condition likely to cause incapacitating pain several times per month to the extent he would be precluded from performing gainful activity for an entire workday; substantially limited in ability to sit throughout the day in a normal seated position; and unable to stand and walk for more than a few hours per day. Tr. at 559. He wrote "[t]he above answers reflect a long standing of progressive incapacity & disability." *Id.*

On November 6, 2013, Dr. Bland wrote a follow up letter in which he explained that Plaintiff had a history of diagnosis and treatment for high-grade left carotid artery stenosis secondary to radiation from a carotid cancer and that Plaintiff had seen Drs. Roberts and Sloan for pain management prior to presenting to him for treatment. Tr. at 591. Dr. Bland disputed Dr. McClure's opinion and indicated Dr. McClure should more

thoroughly review both his records and those of Dr. Sloan. *Id.* Finally, he stated, "[b]ased on my evaluation and records, I feel that Mr. Smith is unable to maintain any sustained gainful employment." *Id.*

Plaintiff argues ALJ Fleming failed to provide good reasons for dismissing Dr. Bland's opinion. [ECF No. 17 at 28–29]. The Commissioner argues ALJ Fleming reasonably concluded the limitations assessed by Dr. Bland were inconsistent with evidence that indicated Plaintiff could perform light work and were based on Plaintiff's subjective complaints. [ECF No. 19 at 13].

ALJ Fleming gave little weight to Dr. Bland's opinion because he found it was not supported by the objective clinical evidence or a review of his records. Tr. at 26. He indicated "it appears that his opinion is based on the claimant's subjective complaints." *Id.*

The undersigned recommends the court find ALJ Fleming failed to appropriately evaluate and weigh Dr. Bland's opinion based on the factors in 20 C.F.R. § 404.1527(c) and 416.927(c). ALJ Fleming provided substantial reasons for declining to accord controlling weight to Dr. Bland's opinion, explaining that it was not well-supported by medically-acceptable clinical and laboratory diagnostic techniques. This conclusion is supported by the record, which shows few objective findings in Dr. Bland's treatment notes. *See* Tr. at 442–52, 525–39, 543–57, 560–61. However, ALJ Fleming failed to weigh the other relevant factors set forth in 20 C.F.R. §§ 404.1527(c) and 416.927(c). He recognized Dr. Bland's status as a treating physician as required by 20 C.F.R. § 404.1527(c)(2) and 416.927(c)(2), but he neglected to discuss the frequency of Plaintiff's

treatment with Dr. Bland, a factor that weighed in favor of accepting Dr. Bland's opinion. *See* Tr. at 24. The record reflects that Plaintiff visited Dr. Bland 26 times between July 2010 and September 2013. Tr. at 443–45, 526–32, 536–39, 546–61, 583–89. ALJ Fleming also failed to adequately consider the nature and extent of Dr. Bland's treatment relationship with Plaintiff. *See* 20 C.F.R. §§ 404.1527(c)(2)(ii), 416.927(c)(2)(ii). He recognized that Dr. Bland was Plaintiff's primary care physician, but he did not consider that Dr. Bland was the only physician who treated Plaintiff's pain in the three years prior to the hearing and, thus, was in the best position to provide an opinion as to the effects of Plaintiff's pain on his ability to work. *See* Tr. at 442–52, 525–39, 543–57, 560–61. Finally, ALJ Fleming failed to assess the consistency between Dr. Bland's opinion and the evidence from Dr. Sloan, Dr. Nicholson, and Dr. Tomarchio, who relied on medically-acceptable clinical and laboratory diagnostic techniques to conclude that Plaintiff experienced significant pain. *See* Tr. at 399–420, 421–26, 567–80. In light of the foregoing, the undersigned recommends a finding that ALJ Fleming's decision to accord little weight to Dr. Bland's opinion was not supported by substantial evidence.

#### b.     Dr. Tomarchio's Opinion

Following the consultative examination on September 15, 2012, Dr. Tomarchio completed a medical source statement. Tr. at 568–73. He indicated Plaintiff should never perform any lifting because of decreased ROM in his cervical spine and upper extremity and unsteady gait. Tr. at 568. He stated Plaintiff could sit for 30 minutes a time and for one hour during an eight-hour workday; stand for 15 minutes at a time and for 30 minutes during an eight-hour workday; and walk for five minutes at a time and for 15 minutes

during an eight-hour workday. Tr. at 569. Dr. Tomarchio based these restrictions on decreased ROM of Plaintiff's spine, upper extremities, and lower extremities and his reduced ability to balance to perform gait maneuvers. *Id.* He indicated Plaintiff could occasionally reach, handle, finger, feel, and push/pull with his bilateral upper extremities, based on decreased ROM in his head and neck as a result of tumor removal. Tr. at 570. He stated Plaintiff could frequently operate foot controls with his bilateral lower extremities. *Id.* He found Plaintiff could never climb stairs, ramps, ladders, or scaffolds; balance; stoop; kneel; crouch; or crawl based on decreased ROM following parotid tumor removal. Tr. at 571. He indicated Plaintiff could never be exposed to unprotected heights, moving mechanical parts, operating a motor vehicle, or vibration, based upon decreased ROM and balance. Tr. at 572. However, he stated Plaintiff could frequently be exposed to wetness, humidity, dust, odors, fumes, pulmonary irritants, extreme cold, and extreme heat. *Id.* He found Plaintiff could not walk a block at a reasonable pace on rough or uneven surfaces and could not climb a few steps at a reasonable pace with the use of a single hand rail. Tr. at 573. Finally, he indicated the limitations had lasted or were expected to last for 12 consecutive months. *Id.*

Plaintiff argues ALJ Fleming rejected Dr. Tomarchio's opinion without addressing the explanation Dr. Tomarchio provided for that opinion and the evidence that supported it. [ECF No. 17 at 31–32].

The Commissioner argues ALJ Fleming  reasonably considered Dr. Tomarchio's opinion in light of Dr. Tomarchio's inconsistent observations and other evidence in the record, including mild diagnostic findings. [ECF No. 19 at 13].

ALJ Fleming gave little weight to Dr. Tomarchio's opinion because he found it to be inconsistent with Dr. Tomarchio's objective findings. Tr. at 26. He explained that Dr. Tomarchio "found normal strength throughout the claimant's body, no deficits in sensation, and grossly intact cerebellar functioning." *Id.* He stated "[t]he most significant [thing] that he found was the claimant's self-limiting behavior in regards to fine and gross motor skills, but he did not indicate that this behavior was medically necessary." Tr. at 26–27. He concluded "it appears that his opinion was based more on the claimant's subjective complaints, and less on any objective findings." Tr. at 27.

The undersigned recommends the court find ALJ Fleming's conclusion regarding Dr. Tomarchio's opinion to be unsupported by substantial evidence for several reasons. First, ALJ Fleming's conclusion that Dr. Tomarchio's opinion was inconsistent with the objective evidence makes little sense in light of the abnormalities Dr. Tomarchio observed. *See* Tr. at 574 (significantly reduced ROM of cervical spine; limited lumbar ROM; diminished bilateral shoulder ROM; slightly reduced bilateral elbow supination and pronation; significantly decreased bilateral hip ROM; positive straight-leg raising tests in the sitting and supine positions bilaterally; difficulty performing tandem walk, heel/toe walk, and squat), 578 (difficulty rising from a seated position, unstable and shuffling gait, abnormal posture and obvious muscle spasm, tenderness to palpation over mid-spine). Second, ALJ Fleming's conclusion that Plaintiff's self-limiting behavior was not medically-necessary finds little support in Dr. Tomarchio's report. Although Dr. Tomarchio indicated Plaintiff engaged in movements designed to protect his neck and back, he did not indicate that Plaintiff was exaggerating his pain or otherwise

50

malingering. *See* Tr. at 579. In fact, Dr. Tomarchio noted obvious muscle spasm as a reason for Plaintiff's guarded movements. Tr. at 578. Third, ALJ Fleming failed to note the consistency of Dr. Tomarchio's opinion with the findings of the other treating and examining physicians. *See* 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4). The consultative orthopedist, Dr. Nicholson, observed Plaintiff to have marked pain behavior, reduced ROM, positive straight-leg raising test, abnormal gait, and muscle spasms. Tr. at 423–24. Dr. Bland similarly indicated Plaintiff had limited abilities to sit, stand, and walk and was further limited by pain. Tr. at 559. Dr. Sloan also observed abnormalities that were consistent with those noted by Dr. Tomarchio, including muscle and tissue loss, spasticity, difficulty standing from a seated position, painful ROM, and tenderness to palpation. Tr. at 399–420. In light of these errors, the undersigned recommends the court find ALJ Fleming failed to adequately weigh Dr. Tomarchio's opinion based on the record as a whole and as guided by the factors set forth in 20 C.F.R. §§ 404.1527(c) and 416.927(c).

c.    Dr. McClure's Opinion

Dr. McClure testified that Plaintiff was capable of performing the full range of medium work and that the diagnoses and restrictions set forth by the treating and consultative physicians were inconsistent with the physical findings of record. Tr. at 73–77.

Plaintiff argues ALJ Fleming erred in giving significant weight to Dr. McClure's opinion. [ECF No. 17 at 33]. He maintains Dr. McClure did not provide an adequate explanation for his conclusion that the objective evidence did not support the opinion

51

evidence in the record. *Id.* at 33–34. He contends that, although ALJ Fleming gave significant weight to Dr. McClure's testimony, he did not adopt Dr. McClure's RFC and failed to explain his reasons for rejecting it. *Id.* at 34. Finally, Plaintiff argues ALJ Fleming failed to explain his reasons for giving more weight to the opinion of a non-treating, non-examining physician than to the opinions of a treating and examining physician. *Id.* at 35.

The Commissioner maintains that ALJ Fleming reasonably gave significant weight to Dr. McClure, but reduced Plaintiff's RFC from the medium to light level based on the state agency consultants' opinions. [ECF No. 19 at 14].

ALJ Fleming gave significant weight to Dr. McClure's opinion, noting that he was a specialist and was an unbiased medical expert. Tr. at 26. He explained that Dr. McClure's testimony was "supported generally by the evidence noted above showing normal strength, sensation, and coordination (Exhibits B1F; B9F; B23F)." *Id.* However, ALJ Fleming indicated he gave greater weight to the opinions of the state agency consultants than to Dr. McClure because he concluded Plaintiff was limited to light work. *Id.*

The undersigned recommends a finding that ALJ Fleming's decision to accord significant weight to Dr. McClure's opinion was not supported by substantial evidence because it was inconsistent with the opinions of the treating and consultative physician and was not adequately explained. During his testimony, McClure admitted his testimony was inconsistent with the other medical opinions in the record. Tr. at 75–76 (Counsel pointed out that Dr. Sloan diagnosed right radiculopathy, but Dr. McClure stated he did

not agree with that diagnosis because it was not supported by any specific test results[8]),
76 (Dr. McClure indicated there was no objective support for Dr. Tomarchio's
indications that Plaintiff had obvious muscle spasm and extremely limited physical
ability). ALJ Fleming further acknowledged that Dr. McClure's opinion was inconsistent
with the opinions of the state agency medical consultants who found Plaintiff could
perform light work. Tr. at 26. When asked to explain his reason for reaching a different
conclusion regarding Plaintiff's limitations than the treating and examining physicians,
Dr. McClure stated "It doesn't, doesn't hang together medically." Tr. at 77. Counsel
pressed Dr. McClure to explain what specific medical evidence would be necessary to
support the other physicians' opinions, but Dr. McClure answered Counsel's question
with a question, indicating Counsel would have to tell him which impairments he was
talking about. *Id.* Counsel stated Plaintiff was treated for neuropathy, radiculopathy, and
muscle lessening. *Id.* Dr. McClure responded "[t]hat doesn't make any sense to me, no,
sir." *Id.* At no point did Dr. McClure explain why the restrictions advanced by the
examining and treating physician failed to "hang together medically" or provide any
guidance as to what the record would need to show to support such restrictions. Although
the Fourth Circuit has held that "the ALJ holds the discretion to give less weight to the
testimony of a treating physician in the face of persuasive contrary evidence," the
undersigned is unable to find that Dr. McClure's unexplained conclusion serves as
"persuasive contrary evidence." *See Mastro*, 270 F.3d at 178; *Hunter*, 993 F.2d at 35. In

---

[8] Dr. Sloan indicated Plaintiff had evidence of cervical and lumbar spondylosis on MRI,
but the record does not contain a cervical or lumbar MRI. *See* Tr. at 419.

light of the inconsistency of Dr. McClure's medical opinion with the record as a whole and his lack of explanation for that inconsistency, the undersigned recommends a finding that substantial evidence did not support ALJ Fleming's decision to give the opinion substantial weight.

d.     State Agency Consultants' Opinions

On March 25, 2010, Dr. Weymouth indicated in the physical RFC assessment that Plaintiff had the following limitations: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk about six hours in an eight-hour workday; sit about six hours in an eight-hour workday; and occasionally climb, balance, stoop, kneel, crouch, and crawl. Tr. at 430–37. Dr. Ferrell assessed the same limitations in a physical RFC assessment on February 25, 2011. Tr. at 517–24.

Plaintiff argues ALJ Fleming erred in giving great weight to the state agency medical consultants' opinions because they were unsupported by the medical evidence and were rendered without review of the opinions of Drs. Bland and Tomarchio. [ECF No. 17 at 36]. The Commissioner argues that the record as a whole supports the ALJ's adoption of the RFC assessed by the state agency consultants. [ECF No. 19 at 14].

ALJ Fleming explained that he gave great weight to the state agency medical consultants' opinions because the consultants were "acceptable medical sources," "unbiased experts in assessing the claimant's limitations under Social Security Rules and Regulations," and their opinions were "consistent with the weight of the objective evidence, which shows that the claimant has maintained generally normal strength, sensation, and coordination (Exhibits B1F; B9F; B23F)." Tr. at 26.

The undersigned recommends a finding that ALJ Fleming placed unsupported emphasis on the opinions of the state agency consultants. While an ALJ may rely on the opinions of non-treating and non-examining physicians that are consistent with the record and may even accord greater weight to the state agency consultants' opinions under appropriate circumstances, the undersigned is reluctant to find that the state agency consultants' opinions were consistent with the record in this case or that ALJ Fleming provided adequate reasons to support according greater weight to the state agency physicians' opinions than to those of the examining and treating physician. *See Tanner,* 602 F. App'x at 101; *Smith*, 795 F.2d at 345; SSR 96-6p. The state agency consultants' opinions were contradicted by those of Drs. Bland and Tomarchio and were rendered more than a year-and-a-half before Dr. Tomarchio's examination of Plaintiff. Given the undersigned's earlier recommendation that the court find ALJ Fleming failed to adequately consider the opinions of Drs. Bland and Tomarchio, the undersigned is unable to find that ALJ Fleming reconciled the state agency consultants' opinions with the other opinion evidence of record.

### 3.    Conflicts Between VE Testimony and *DOT*

Plaintiff argues ALJ Fleming failed to acknowledge and erroneously concluded no conflicts existed between the VE's testimony and the *DOT*. [ECF No. 17 at 38]. He contends the *DOT*'s description of the mail sorter and plumbing assembler positions conflicts with the restriction in the RFC for only occasional use of the left hand. *Id.* He also maintains the non-exertional restrictions were not accounted for in the *DOT* and the VE failed to provide a basis to support her testimony that the identified jobs could be

performed. *Id.* at 38–39. In light of these errors, Plaintiff argues the Commissioner failed to meet her burden at step five to show that he could perform other work that existed in significant numbers in the economy. *Id.* at 39.

The Commissioner maintains Plaintiff presents no authority for his assertions that the jobs identified were inconsistent with their descriptions in the *DOT*. [ECF No. 19 at 15].

The provisions of 20 C.F.R. §§ 404.1566(d) and 416.966(d) provide that the ALJ should take administrative notice of job information contained in the *DOT*. Furthermore, SSR 00-4p indicates that "we rely primarily on the *DOT* (including its companion publication, the *SCO*) for information about the requirements of work in the national economy." In some cases, ALJs call upon the services of a VE to address how certain restrictions affect a claimant's ability to perform specific jobs. 20 C.F.R. §§ 404.1566(e), 416.966(e). Because the opinions of VEs sometimes conflict with the information contained in the *DOT*, the SSA promulgated SSR 00-4p to explain how these conflicts should be resolved.

Pursuant to SSR 00-4p, before relying on VE evidence to support a disability decision, the ALJ must "identify and obtain a reasonable explanation for any conflicts between occupational evidence" in the *DOT* and in its companion publication, the *SCO*, and explain in the determination or decision how any conflict that has been identified was resolved. The ALJ has an affirmative responsibility to ask about any possible conflict between the VE testimony and the information provided in the *DOT*. SSR 00-4p. "When vocational evidence provided by a VE or VS is not consistent with the information in the

*DOT*, the adjudicator must resolve this conflict before relying on the VE or VS evidence to support a determination or decision that the individual is or is not disabled." *Novak v. Commissioner of Social Sec. Admin.*, C/A No. 9:08-2687-HFF-BM, 2009 WL 1922297, at *2 (D.S.C. June 30, 2009), citing SSR 00-4p. "The adjudicator will explain in the determination or decision how he or she resolved the conflict." *Id.* "The adjudicator must explain the resolution of the conflict irrespective of how the conflict was identified." *Id.* However, the Fourth Circuit has indicated ALJs are not required to uncover and resolve all conflicts between the *DOT* and a VE's testimony, but are only required to uncover and resolve "apparent conflicts." *See Fisher v. Barnhart*, 181 F. App'x 359, 365 (4th Cir. 2006); *Justin v. Massanari*, 20 F. App'x 158, 160 (4th Cir. 2001). This court has indicated "[t]he question, then, is whether here there was a conflict between the VE's testimony and the *DOT* that was so apparent that the ALJ should have picked up on it without any assistance." *Acevedo ex rel. Acevedo v. Colvin*, C/A No. 0:12-2137-TMC, 2014 WL 197738, at *5 (D.S.C. Jan. 16, 2014).

ALJ Fleming complied with his affirmative responsibility to ask the VE about potential conflicts between her testimony and the *DOT*, and the VE indicated her testimony was consistent with the *DOT*. Tr. at 95. However, a review of the *DOT*'s descriptions of the jobs of mail sorter[9] and plumbing assembler[10] reveals that these

---

[9] The *DOT* describes the job of mail clerk as follows: "Sorts incoming mail for distribution and dispatches outgoing mail. Sorts mail according to destination and type, such as returned letters, adjustments, bills, orders, and payments. Readdresses undeliverable mail bearing incomplete or incorrect address. Examines outgoing mail for appearance and seals envelopes by hand or machine. Stamps outgoing mail by hand or with postage meter." DICOT, 209.687-026 (G.P.O.), 1991 WL 671813.

positions require frequent handling. DICOT, 209.687-026 (G.P.O.), 1991 WL 671813;

DICOT, 706.684-086 (G.P.O.), 1991 WL 679065. This conflicts with the limitation of

only occasional handling with the left upper extremity that ALJ Fleming included in the

RFC assessment. In addition, the third job identified by the VE, proofreader helper, does

not match the *DOT* number the VE provided,[11] which rendered that portion of the VE's

testimony inconsistent with the *DOT*. *See Edmond v. Colvin*, C/A No. 8:12-1081-RMG-

JDA, 2013 WL 4647516, at *11 (D.S.C. July 29, 2013) ("Moreover, two of the job codes

identified by the VE do not match listings in the *DOT*, which testimony would also be

inconsistent with the *DOT*."). Because a conflict exists, it is necessary to determine

whether the conflict was apparent and, thus, triggered the ALJ's affirmative duty to

identify and resolve conflicts between the *DOT* and the vocational testimony. *See Novak*,

2009 WL 1922297, at *2. The undersigned finds the conflict between the VE's testimony

and the *DOT* was an apparent conflict because it was evident in merely reading the job

descriptions in the *DOT* and comparing them with the RFC. *See Dross-Swart v. Astrue*,

---

[10] The *DOT* provides the following description of a plumbing-hardware assembler: "Assembles plumbing fixtures, such as faucets, stoppers, and shower heads, using handtools and power tools. Screws pipe fittings into grease traps, check valves, and other plumbing fixtures, using pipe wrench or power wrench. Drills holes in fixtures for bolt attachments, using power drill. Fits parts together and secures parts with screws, bolts, or solder, using handtools and flame solderer. May adjust valves and other linkage to ensure free action of moving parts. DICOT, 706.684-086 (G.P.O.), 1991 WL 679065.

[11] The *DOT* contains definitions for "proofreader," *DOT* number 209.387-030 (DICOT 209.387-030 (G.P.O.), 1991 WL 671790), "proofreader," *DOT* number 209.687-010 (DICOT 209.387-030 (G.P.O.), 1991 WL 671790), "production proofreader," *DOT* number 247.667-010 (DICOT 247.667-010 (G.P.O.), 1991 WL 672286), and "copy holder," *DOT* number 209.667-010 (DICOT 209.667-010 (G.P.O.), 1991 WL 671806). Each of these has a similar name or *DOT* number to that identified by the VE. Therefore, it is impossible for the undersigned to determine which the VE identified as a possible job Plaintiff could perform.

872 Fed. Supp. 2d 780, 800 (N.D. Ind. 2012) (holding that a conflict was apparent from "the very terms of the positions' descriptions and the ALJ's RFC determination"); *accord Graham-Willis v. Colvin,* C/A No. 1:12-2489-JMC, 2013 WL 6840465, at *7 (D.S.C. Dec. 27, 2013) (holding an apparent conflict existed between the jobs identified by the VE that had GED reasoning levels of 3 and the limitation in the hypothetical to performance of only simple tasks), citing *Phillips v. Astrue*, C/A No. 3:11-1085-MBS, 2013 WL 353604, at *2 (D.S.C. Jan. 29, 2013); *Reid v. Astrue*, C/A No. 6:10-2118-MBS-KFM, 2012 WL 667164, at *12–13 (D.S.C. Feb. 8. 2012), *adopted by* 2012 WL 4482943; *Martin v. Astrue,* C/A No. 6:11-1572-TMC-KFM, 2012 WL 4479280, at *15–16 (D.S.C. July 27, 2012), *adopted by* 2012 WL 4482943. In light of ALJ Fleming's error in failing to identify and resolve the conflict between the *DOT* and the VE's testimony, the undersigned concludes he failed to comply with requirements of SSR 00-4p.

III.     Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of 42 U.S.C. § 405(g), that this matter be reversed and remanded for further administrative proceedings.

IT IS SO RECOMMENDED.

August 12, 2015                              Shiva V. Hodges
Columbia, South Carolina                     United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).